IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
------------------------------------------------------------

ROBIN DEGNER,

                Plaintiff,              OPINION AND ORDER

    v.
                                            16-cv-674-wmc

JUNEAU COUNTY, JUNEAU COUNTY DEPARTMENT
OF HUMAN SERVICES, and SCOTT ETHUN,

                Defendants.
------------------------------------------------------------

      Robin Degner brings this action under the Family and Medical Leave Act, 29 U.S.C. § 2611 *et seq.*, claiming that defendants: (1) failed to restore her to the position of Children's Services Manager or its equivalent after her FMLA leave; and (2) engaged in retaliatory conduct culminating in termination of her employment because she exercised her FMLA rights. Defendants have moved for summary judgment on both claims. (Dkt. #16.) For the reasons explained below, the court will grant summary judgment to defendants Juneau County Department of Human Services and supervisor Scott Ethun, but concludes that a reasonable jury could infer from the record that the remaining defendant, Juneau County itself, both interfered with plaintiff's rights under the FMLA and engaged in retaliatory conduct by terminating her employment.

UNDISPUTED FACTS[1]

**A. Background**

      Robin Degner was employed by Juneau County, as its Children's Services Manager

---
[1] For purposes of summary judgment, the court finds the following facts to be material and undisputed except as otherwise noted.

in its Department of Human Services ("DHS") from March 30, 2012 until February 1, 2016. Throughout her employment, Degner was supervised by Scott Ethun, the DHS Human Services Director.

Before March 2012, DHS had a single Professional Services Manager responsible for both Children's Services, including Juvenile Justice and Child Protection Services, and Mental Health Services, including Alcohol and Other Drug Abuse Services. That position was last occupied by David Rung.

In March, 2012, the Professional Services Manager position was split into two positions: a Children's Services Manager and a Behavioral Health and Clinical Services Manager. Rung then became the Behavioral Health and Clinical Services Manager, and Degner was hired on as the Children's Services Manager by Scott Ethun.

### B. Degner's Early Performance

As Children's Services Manager, Degner was responsible for performing juvenile intake and child protective services. These responsibilities required Degner to have a good working relationship with other managers inside DHS, as well as with other Juneau County department heads. Given their new positions, Degner and Rung often worked together as well.

Rung maintains that Degner was extremely difficult to work with and that they had a strained relationship. (Rung Decl. (dkt. #27) ¶ 4.) While Degner does not dispute their relationship was strained, she questions the fairness of Rung's criticism. Regardless, it is undisputed that Rung brought his concerns to their mutual supervisor, Ethun, on several occasions, including expressing his belief that Degner was not a good leader and that hiring

her was a mistake. In light of these concerns, Ethun further consulted with Degner's staff members, who provided both positive and negative feedback.

The parties dispute what exactly Ethun himself thought about Rung's concerns or Degner's performance during her first six months. Specifically, Degner would dismiss Ethun's affidavit outlining his early concerns about Degner's performance and communication style as "self-serving" in the present litigation. (Pl's. Response to Defs.' Proposed Findings of Fact (dkt. #32) ¶ 22.) While the parties dispute precisely when it occurred, there is no dispute that Ethun had a private conversation with Degner during this early period about the need to contain her own emotions and to serve as a better example to her staff. (*Id*. at ¶ 23.)

Ethun also held further meetings with Degner's staff and other employees before her six-month probationary performance review. Performing such interviews was not part of Ethun's typical practice. While some staff members reported a crisis mode in the Children's Services Unit, the overall tenor of the comments Ethun received were positive toward Degner.[2]

Moreover, whatever Ethun's remaining concerns may or may not have been at this time, he provided Degner with a series of favorable early performance reviews. In particular, Degner's one-year review on March 30, 2013, rated her as "Very Good" or ""Exceptional" in all categories -- the two highest ratings available. Degner's two-year review on February 13, 2014, also rated her as "Very Good" or "Exceptional" in all

---

[2] The parties do dispute whether some staff members told Ethun that Degner appeared overwhelmed in her role. (Defs.' Reply to Pl's. Response to Defs.' Proposed Findings of Fact (dkt. #38) ¶ 25.)

categories except "Communication" where she received a "Satisfactory" rating. The comments in these early evaluations were similarly positive and optimistic in tone, while identifying some areas for improvement.

### C. Degner's Corrective Action Plan

During 2014, however, Ethun received additional complaints from a variety of Children's Services staff members, as well as other Juneau County management representatives. Degner does not dispute that a significant amount of this criticism related to her leadership skills, as well as other concerns, but does dispute the details of several incidents identified as giving rise to criticism. (Defs.' Reply to Pl's. Response to Defs.' Proposed Findings of Fact (dkt. #38) ¶¶ 37-43.) Still, Degner acknowledges that she failed to submit a grant application for Title IV-E funding in the fall of 2014, despite it being her responsibility, which resulted in the loss of a source of funding for her department.

As a result of this and other criticisms, Ethun placed Degner on a Corrective Action Plan in early December of 2014, identifying in writing nine areas in which improvement was needed: (1) organization of work and prioritization of duties while paying close attention to and meeting deadlines; (2) ensuring staff kept up with documentation and the creation of logs each week; (3) returning phone calls ideally within a day; (4) assigning duties to staff to allow for more focus on management of the program and teaching staff to delegate as well; (5) being available for individual supervision with staff in a private location; (6) exhibiting professionalism in the workplace; (7) leading by example; (8) maintaining awareness of the schedule and how much could be taken on; and (9) paying attention to the expense budget for the department's programs, with a focus on ways to

4

increase revenue and reduce cost. Degner and Ethun agreed that this Corrective Action Plan would remain in place for six months and would be removed from Degner's file if progress occurred in each of the nine areas.

**D. Degner's 2015 Performance**

On March 25, 2015, Degner was issued a performance evaluation that noted she had improved in all areas. Indeed, this evaluation rated Degner as "Good" or "Very Good" in every category. Based on that evaluation and subsequent performance, Degner was formally removed from the Corrective Action Plan on May 28, 2015. In contrast to the positive tenor of this performance evaluation, for which Ethun was principally responsible, he now maintains that he continued to hold private concerns about Degner's performance and ability to function going forward, as the Children's Services Manager. (Ethun Decl. (dkt. #19) ¶ 39.) Degner would again question the credibility of Ethun's after-the-fact assertion. (Pl's. Response to Defs.' Proposed Findings of Fact (dkt. #32) ¶ 59.)

Amidst a series of additional smaller incidents involving or concerning Degner, the details and admissibility of which are also in dispute, Ethun met with Juneau County Corporation Counsel David Lasker on or about September 22, 2015, regarding Ethun's concerns and belief that another corrective action plan would be unlikely to resolve Degner's continuing lack of positive leadership (the parties dispute whether Degner's behavior regressed after some improvement under the first corrective action plan). Lasker agreed that it would be appropriate to explore replacing Degner, while also encouraging Ethun to give Degner as much support as possible. At that time, Ethun chose not to tell Degner that he was considering replacing her.

5

### E. Degner's FMLA Leave and Termination

Still unaware of how far things had progressed, Degner requested on December 21, 2015 and was approved for up to six weeks of FMLA leave in connection with a total knee replacement surgery. Degner's estimated return to work date following her surgery was February 1, 2016. During this leave, Degner was occasionally contacted by phone.

On or about January 22, 2016, it was discovered that a child serviced by Juneau County, identified only as "Victoria C.," had lost Social Security disability payments and eligibility. The defendants assert, and Degner denies, that this occurred because she failed to engage in necessary communications despite telling a staff member taking maternity leave that she would handle it. (Defs.' Reply to Pl's. Response to Defs.' Proposed Findings of Fact (dkt. #38) ¶¶ 79-83.) That same day, Ethun spoke to a local attorney, providing children's services in Juneau County, Rebecca Richards-Bria, who criticized Degner, although she disputes the fairness of Richards-Bria's criticism. (Id. at ¶¶ 87-88.) Around the same time, two of Degner's most senior staff, Kelly Firlus and Coralie Burrows, also sought out Ethun to report continuing concerns about her lack of leadership. While Degner disputes the substance of their criticism, it is undisputed that Firlus and Burrows (1) complained of an unprofessional atmosphere; (2) indicated that staff morale was very low, and (3) described how Degner's constant blaming of others was creating a poor attitude among staff. (*Id*. at ¶ 85.) There is also no dispute that Firlus and Burrows requested new leadership within the Children's Services Unit, indicating that they would seek employment elsewhere if the conditions continued.

Following this additional input, Ethun maintains that he came to believe Degner

had lost the respect of her staff and control of the unit, although Degner disputes this as well. (Pl's. Response to Defs.' Proposed Findings of Fact (dkt. #32) ¶ 89.) Ethun then met again with Lasker to discuss his belief that it was time to replace Degner. Lasker reported concerns of his own, and he supported Ethun's recommendation. Still, they agreed Ethun should not inform Degner that her employment would be terminated until she returned from her approved leave of absence.

On January 25, 2016, Degner returned to her work as Children's Services Manager. Until her termination just four days later, Degner utilized her FMLA rights to work part-time. On January 28, 2016, Ethun told Degner that she could either choose to resign or be terminated. Degner was also issued a letter by Ethun that claimed his decision was unconnected to Degner's medical leave, and the two did not debate the reasons for her termination.

Degner formally resigned her employment effective February 1, 2016, although the parties agree that her resignation was a de facto termination.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id*. at 248. "In employment discrimination cases . . . the summary

judgment standard [is applied] with rigor because intent and credibility are crucial, often determinative, issues." *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir. 1998) (internal quotation marks omitted).

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[3] If defendants meet their initial burden on an issue for which plaintiff will bear the burden of proof at trial, then defendants must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. Moreover, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion, *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If it fails to do so, "the moving party is entitled to a judgment as a matter of law." *Id*. at 250. The court will take up defendants' stated grounds for summary judgment in reverse order.

**I. Appropriate Parties**

Defendants argue that plaintiff's claims here are against Juneau County and, accordingly, defendants Scott Ethun and the Juneau County Department of Social Services

---

[3] Here, defendants have moved for summary judgment in their favor on Degner's FMLA-related claims, and they also argue that defendant Scott Ethun and the Juneau County Department of Human Services should be excused from this case.

should be excused from this lawsuit. Because Scott Ethun has only been sued in his official capacity and the Department of Social Services is merely a division of Juneau County, this court quite agrees and will dismiss those two parties.

"Normally the legal entity which employs the employee is the employer under FMLA." 29 C.F.R. § 825.104(c). To the extent it is helpful to examine the § 1983 context, a suit brought against a government official solely in his or her official capacity is indistinct from a claim against the official's governmental entity. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). This is also true of the remedies available: "while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id*. Consequently, there is no reason to keep Scott Ethun as a named party in suit, when the allegations relate only to his official capacity and Juneau County is a party.

Similarly, since Juneau County Department of Human Services is not a legally-distinct entity from defendant Juneau County for purposes of plaintiff's claims here, there is no legal basis, much less any need, to keep it as a named party in suit. *See, e.g.*, *Wagner v. Washington County*, 493 F.3d 833, 835 (7th Cir. 2007) (noting that sheriff's department was a division of the county and not a separate, justiciable entity). Finally, since plaintiff's briefing does not dispute that the inclusion of Ethun and the Juneau County Department of Human Services is unnecessary and inappropriate, any objection to their dismissal is

now waived. *See Palmer v. Marion Cnty*, 327 F.3d 588, 597-98 (7th Cir. 2003) (claims not addressed in a summary judgment opposition brief are waived).

**II. Interference**

This leaves the substance of plaintiff's claims themselves. Degner's first claim is for interference with her FMLA rights under 29 U.S.C. § 2615(a)(1), which requires her to establish that: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006).[4] Only the fifth element is in dispute here: whether FMLA benefits were denied in relation to Degner's constructive termination.

Degner maintains that she was effectively denied her FMLA right to reinstatement having been terminated only a matter of days after returning from continuous FMLA leave and while using two hours per day of intermittent FMLA leave. While Juneau County maintains that the decision to terminate Degner was unrelated to her FMLA leave, which would preclude a finding of liability if true, summary judgment is inappropriate at this juncture because a reasonable jury could infer that Degner's taking FMLA leave and continuing to take intermittent leave *was* a factor in Juneau County's subsequent decision to terminate her.

In particular, the close proximity of Degner's termination to her exercise of FMLA

---

[4] No finding of discriminatory intent is required. Pagel v. TIN Inc., 695 F.3d 622, 626 (7th Cir. 2012).

10

rights could justify an inference that the two events were causally connected. While an employee cannot be fired because she took FMLA leave, "an employee may be fired for poor performance when she would have been fired for such performance even absent her leave." *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001). Certainly Juneau County has produced evidence of potential deficiencies in Degner's leadership and communication style that *might* have prompted defendants' conclusion that she was in the wrong position, even if she had not taken FMLA leave, but she maintained her continuous employment in the same positon for nearly four years despite Juneau County's purported awareness of the same or similar issues that allegedly led to her termination.

Of course, Juneau County may argue that the final straw was a closer-in-time event -- such as Firlus and Burrow's ultimatum -- but a jury could reasonably conclude that the proximity of Degner's FMLA leave to her termination, in light of her employment history, is more instructive. Indeed, the Seventh Circuit has suggested that a lapse in time between the discovery of deficiencies and a termination may create a genuine dispute of fact in the context of an FMLA interference claim:

> We can imagine circumstances in which the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware).

*Kohls*, 259 F.3d at 806.

Juneau County's inaction toward Degner for years after reports of problems with her and in her unit could also lead to an inference that the County attributed the unit's

11

problems to institutional deficiencies and overwork, rather than to Degner's performance. Such an inference of causation in Degner's favor is further strengthened by her history of generally positive performance reviews. *See, e.g.*, *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743 (7th Cir. 1999) (consistently positive performance evaluations are evidence that an employee is meeting legitimate expectations). At a minimum, it is relevant that Degner never received a rating below "Satisfactory" in *any* category in which she was formally evaluated before taking FMLA leave. Simply put, Juneau County will have to explain to a jury why after years of inaction and solid reviews, it suddenly chose to act on alleged, longstanding concerns about Degner's performance only a few days after her return from FMLA leave.

If it is merely "that [an instance of] leave permitted [an] employer to discover the problems [it cannot] logically be a bar to the employer's ability to fire [a] deficient employee. *Kohls*, 259 F.3d at 806. But the record here is more problematic, as the claimed discoveries during Degner's leave were not new, but at most reinforced concerns that Juneau County maintains were known for some time. So while a jury may well credit Juneau County's explanation that its decision to terminate Degner was performance-based and its proximity to her FMLA leave was coincidental, summary judgment is inappropriate when this proximity and Degner's (at worst, mixed) employment history could also create an inference that the exercise of Degner's FMLA rights was a factor in the County's decision to terminate her employment.

**III. Retaliation**

As for Degner's remaining claim that Juneau County retaliated against her for

exercising FMLA rights in violation of 29 U.S.C. § 2615(a)(2), she may use either a direct or indirect method of proof. *See Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). "Under the direct method, [which Degner utilizes, an employee] must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Id*. A retaliation claim also "requires proof of discriminatory or retaliatory intent while [an interference claim] requires only proof that the employer denied the employee his or her entitlements under the Act." *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005).[5]

As the first two elements are undisputed here, Juneau County must prove that *no* reasonable jury could infer causation based on a discriminatory motive to prevail on its summary judgment motion. To establish causation, however, "the plaintiff does not need to prove that 'retaliation was the only reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (internal citations omitted).

A plaintiff must present direct or circumstantial evidence that permits a trier of fact to infer intentional discrimination on the part of the decision-maker under the direct method of proof. *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008).

---

[5] "[I]nstead of separating evidence under different methods of proof," the Seventh Circuit recently affirmed that '[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself -- or whether just the "'direct'" evidence does so or the "'indirect'" evidence.'" *Golla v. Office of the Chief Judge of Cook Cty.*, No. 15-2524, 2017 WL 5476342, at *3 (7th Cir. Nov. 15, 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Still, the traditional framework of "direct" and "indirect" proof remains useful. *Ortiz*, 834 F.3d at 766.

Permissible "[c]ircumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group" that allows a reasonable jury to "infer that retaliatory animus motivated the decisionmaker to take an adverse employment action against the employee." *Long v. Teachers' Ret. Sys. Of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009).

While Degner faces a difficult task in proving such causation, a jury could once again reasonably conclude from the timing of Degner's termination and her generally positive employment history that a retaliatory motive was present. Such a finding might also support a reasonable inference that Juneau County's alternative explanation is a pretext, at least as to part of its motivation. While it may be that Degner's evaluations were an attempt to maintain morale, or one of the other benign explanations offered by defendants, resolving this dissonance requires credibility determinations on the part of the trier of fact. For example, a jury might reasonably choose to discount the early performance concerns that led to Degner's Corrective Action plan, given the length of time that elapsed between those concerns and her termination, or could reasonably choose to credit those concerns, especially after being reinforced while Degner was on leave. Again, however, this conflict will have to be resolved on the evidence presented at trial.

ORDER

IT IS ORDERED that defendant's motion for summary judgment (dkt. #16) is GRANTED in part and DENIED in part as set forth above.

Entered this 5th day of March, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge